Gerónimo Vallecillo, demandante y apelante, *v.* Fernando Suria González y su esposa Cruz Navedo, demandados y apelados.

Núm. 6865.—*Sometido:* Noviembre 5, 1937. *Resuelto:* Enero 21, 1938.

*Jaime Sifre, Jr.* y *Arturo Ortiz Toro,* abogados del apelante; *Antonio Reyes Delgado,* abogado de los recurridos en el incidente para mostrar causa.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

En julio 26, 1932, Gerónimo Vallecillo, por sus abogados, inició en la Corte de Distrito de Arecibo un procedimiento sumario hipotecario contra una finca rústica situada en el barrio de Palmas Altas, del término municipal de Manatí, antes Barceloneta, de doscientas noventa y tres cuerdas, en colindancia por el Norte con la zona marítima. El dueño de dicha finca, Fernando Suria, la hipotecó para responder de cierta deuda que no satisfizo. De ahí la ejecución.

Seguido por todos sus trámites el procedimiento, se vendió la finca en pública subasta en noviembre 9, 1932, a Vallecillo, que ofreció por ella la suma de $12,500 para abonar a su crédito de $25,000.

Así las cosas, en marzo 30, 1933, Vallecillo presentó a la corte una "Moción solicitando posesión de la totalidad de la finca." Alegó textualmente:

"1. Que en 9 de noviembre de 1932 se celebró la venta en pública subasta de la finca objeto de ejecución hipotecaria en este caso, habiéndose adjudicado la misma en dicho remate al demandante para abonar a su crédito contra los demandados.

"2. Que en dicho día el demandante tomó posesión de la finca por entrega que le hiciera el Márshal de esta Corte, pero que posteriormente ha encontrado viviendo en parte de la finca algunas personas que se han negado a desalojar la misma a pesar de los requerimientos del demandante."

Y pidió a la corte que ordenara al secretario que expidiera el correspondiente mandamiento al márshal. La moción fué declarada con lugar.

En junio 23 siguiente presentó otra moción el ejecutante manifestando que el márshal encontró viviendo en la finca las personas que menciona y les notificó que la finca había pasado a ser propiedad del demandante, concediéndoles treinta días para el desalojo, apercibidos de lanzamiento. Eso manifestado y alegado además que el plazo había transcurrido sin que los ocupantes de la finca nada hicieran, pidió a la corte que ordenara al secretario que expidiera mandamiento al márshal para que procediera sin dilación al lanzamiento.

La moción fué denegada en los siguientes términos:

"Vista la moción presentada por el demandante en este caso interesando se ordene al márshal haga desalojar a un número de personas que tienen casas ubicadas en los terrenos del demandante, y vistos los informes recibidos del márshal, quien alega que tales se encuentran radicadas fuera del perímetro de la finca adjudicada al señor Vallecillo, y tomando en consideración, además, que ya el demandante fué puesto en la posesión de la finca adjudicádale, entendiendo la Corte que lo que ahora interesa sería motivo a una acción distinta para determinar si las personas ocupantes de ese lugar están dentro del perímetro de sus terrenos, la Corte deniega la moción presentada."

Modificó su petición el ejecutante y la corte en julio 5, 1933, resolvió:

". . . que se expida una orden, cuando lo solicite la parte actora, para que dichas personas comparezcan en el día y hora que señalare esta Corte, para que muestren causa, si alguna tuvieren, por qué no debe ordenarse al márshal que proceda a lanzarlos conjuntamente con sus muebles de la propiedad objeto de este ejecutivo hipotecario."

Solicitada la orden y expedido y cumplimentado el mandamiento, en diciembre 1, 1933, comparecieron veintiséis personas y se opusieron al lanzamiento exponiendo sus razones en una contestación escrita conjunta presentada por medio de abogado.

Se practicó prueba y el 30 de abril de 1934 la corte declaró no haber lugar al lanzamiento. Apeló el ejecutante, quedando radicados la transcripción de los autos en noviembre, 1934, y el alegato del apelante en julio, 1935. Los apelados no presentaron alegato ni comparecieron a la vista del recurso que se celebró en noviembre 5, 1937.

Nueve errores señala el apelante todos en relación con la apreciación de la prueba por el juez sentenciador según aparece de su resolución de abril 30, 1933, como sigue:

"No cabe duda de que el señor Vallecillo es dueño de la finca compuesta de 293 cuerdas descrita en el contexto de esta resolución, por cuanto, no sólo lo ha demostrado mediante la aportación de la escritura de adjudicación otorgádale por el márshal sino porque, a mayor abundamiento, no se niega lo que es evidente. Pero, en el incidente que ahora resolvemos no se discute si el señor Vallecillo es o no propietario de la susodicha finca. El objeto de esta contienda es determinar si las personas citadas ocupan con sus casas parte de los terrenos del señor Vallecillo o no. Los requeridos aportaron varios testimonios para demostrar que sus casitas no están ubicadas sobre la finca del señor Vallecillo, sino en terrenos quizá pertenecientes al Pueblo de Puerto Rico. Entre esos testimonios está el del señor Francisco Miranda, Márshal de esta Corte, quien declaró que esa gente vive al final de la parte Norte, existiendo una carretera que divide sus casas de la finca y que en algunos sectores hay maya entre la finca y dicho camino. También depuso el sub-márshal, Hernando Mattei, manifestando que existe un camino vecinal entre la finca y las casas de esas personas y que estas edificaciones se levantan entre el mar y el camino vecinal. Uno de los testimonios más interesantes fué el de Félix R. Rivera, secretario de esta Corte. Declaró Rivera que el primitivo dueño de la finca, señor Suria González es primo de su esposa y él (el testigo) conoce muy bien aquel sitio porque estuvo durante mucho tiempo empleado con la Central Plazuela y por ello sabe que el camino municipal que desde Barceloneta corre hasta Palmas Altas fué construído, parte en terrenos pertenecientes a Suria, donados por él al Municipio, y parte sobre terrenos de la zona marítima. Félix Hernández dijo llevar residiendo en aquel sitio veintitrés años y que su casa ubica entre el mar y la carretera. Lo mismo expuso Zenón Nogueras. Cayetana Román, anciana de setenta años, declaró que hace sesenta años

reside en el mismo sitio y aquellos terrenos pertenecen a la zona marítima. Elena Domínguez depuso ser viuda y que su esposo le dejó la casa que allí tiene, habiendo residido en ese sitio durante treinta y ocho años. Fernando Rosado manifestó haber residido toda su vida allí. Antonia Domínguez, otra anciana de setenta años de edad, expuso que antes del Ciclón de San Ciriaco ya tenía su casita en aquel lugar.

"Por parte del demandante declaró Félix Guzmán diciendo: que cuando él arribó a la finca para hacerse cargo de ella como mayordomo ya existían unas cercas de alambres que dividían la finca del camino vecinal; que voltearon la finca y el señor Vallecillo le mostró que la colindancia Norte es el mar pero que las casas todas están de la cerca hacia el mar.

"El juzgador efectuó una inspección ocular del sitio y pudo observar que para arribar a él se toma un camino vecinal que, partiendo de Barceloneta, se prolonga en una longitud de cuatro kilómetros aproximadamente hasta finalizar en el lugar. Hay allí un caserío integrado por más de sesenta casas y, desde tiempo inmemorial, se le conoce con el nombre de Palmas Altas. Este caserío es un barrio de Barceloneta y figura en el mapa de nuestra isla. Observó, singularmente, el juzgador que exceptuando una, todas las demás casas ubican en el espacio enmarcado entre el camino vecinal antes aludido y la linde del mar. El terreno es un poco alto, formando en relación con la playa, una especie de talud, de dos metros aproximadamente de altura. La playa propiamente dicha se inicia en la base del talud con una anchura de diez metros más o menos y cuando la mar se torna un tanto borrascosa, al romper las olas viene a morir en la base del talud. La finca del señor Vallecillo está separada del camino antes dicho por una cerca de alambres de púas. Al final del camino se encuentran unas edificaciones, establecimientos y muelle de Plazuela Sugar Co. por el cual se efectúan embarques de los azúcares elaborados por dicha corporación. Llamó poderosamente la atención del juzgador la circunstancia siguiente: si se extendiese hacia el Norte, hasta el límite del talud, la cerca que cierra la colindancia Oeste de la finca del señor Vallecillo, observaríamos que el camino tantas veces mencionado quedaría interceptado y por ende, Plazuela Sugar Co. no tendría acceso a sus establecimientos y muelle.

"En el acto de la inspección ocular testificó el demandante haber sido administrador de la Central Plazuela durante muchos años y por tal motivo haber visitado en varias ocasiones los terrenos del

señor Suria Chaves, constándole que la colindancia Norte de la finca era la zona marítima. Asimismo presentó el actor un plano de la finca levantado por un agrimensor. A primera vista se percibe que, aparte de tratarse de un plano antiquísimo el mismo representa la porción de terrenos ubicados al Este del camino de Barceloneta a Palmas Altas, pero de las tierras situadas al Oeste del sendero no aporta dato alguno. Y precisamente a partir del ángulo que forma el camino de Palmas Altas con el camino de la Boca, hacia occidente es que ubican la mayor parte de las casas en disputa. De forma, que el plano presentado no puede ser estimado como evidencia concluyente, ya que sólo representa una fracción de la finca, no su totalidad.

"Aquilatada la evidencia aportada por el señor Vallecillo, ¿puede el juzgador decidir que se ha demostrado convincentemente que los terrenos ocupados por las personas citadas en este incidente integran la finca de aquél? No, indudablemente no. Tampoco puede concluir que no pertenezcan.

"Es un hecho indubitado que el márshal puso al señor Vallecillo en posesión de la finca, según aparecía acotada con cercas de alambre. El señor Vallecillo pretende que el márshal le dé posesión de tierras situadas fuera del perímetro acotado y el juzgador estima que dicho funcionario no puede hacer tal, ni la corte ordenarlo en un procedimiento sumario ejecutivo hipotecario. Porque no debemos olvidar que se trata solamente de dar a un adjudicatario posesión del fundo comprado, con aquellas características que presentaba mientras perteneció al deudor ejecutado y no puede aceptarse que, por el sólo hecho de pasar a otras manos, cambie de cabida o lineamientos. Si el adjudicatario de propiedad en esta clase especial de procedimientos, luego de tomar posesión de ella, se percata de la circunstancia de estar otras personas poseyendo parte de sus terrenos, puede acudir a una porción de remedios, todos los cuales resultan adecuados y eficaces para recuperar el remanente de su feudo, pero la substitución de recursos definidos en la ley, dentro de los cuales existe la oportunidad amplia para todas las partes de dilucidar la controversia por remedios perentorios y constreñidores, no debe ser amparada por los tribunales de justicia. Es obvio que el adquirente de una finca vendida en subasta judicial está investido del derecho a tomar posesión de ella; pero la compra no le autoriza a invadir otras tierras colindantes.

"Invoca el señor Vallecillo varias cuestiones legales que, a juicio del juzgador, no tienen aplicabilidad en este caso. La primera pro-

posición legal en que abroquela el demandante su caso es que la actitud de estas personas, al negarse a desalojar los sitios que ocupan, constituye una suspensión o interrupción del procedimiento sumario ejecutivo, el cual sólo puede ser suspendido cuando concurren los casos fijados en el Artículo 175 del Reglamento de la Ley Hipotecaria. Nos cita el caso de *Arroyo* v. *Zavala*, 40 D.P.R. 269, en apoyo de la alegación según la cual el procedimiento ejecutivo hipotecario no termina sino con la posesión, la escritura y su inscripción. Estamos en un todo contestes con el señor Vallecillo. En lo que no coincidimos es en estimar la situación de los ocupantes de tierras en Palmas Altas como interruptiva del ejecutivo hipotecario. Y no estamos de acuerdo en ese particular, porque el señor Vallecillo tomó posesión de la finca dádale, por el márshal, y ahora pretende hacer desalojar a unas personas de determinado lugar, no habiéndose probado que esas tierras formen parte de su finca. Resultaría absurdo que el adquirente de una propiedad vendida mediante ejecutivo hipotecario tuviese necesidad de seguir pleitos contra detentadores de ella; pero, no es menos cierto que el título adquirido por un adjudicatario en esas condiciones no le autoriza tampoco a posesionarse de terrenos adyacentes que no integren el fundo por él comprado.

"Otra de las proposiciones jurídicas formuladas por el señor Vallecillo consiste en pretender abroquelar este incidente como si se tratase de un procedimiento de desahucio. Para ello, alega la inexistencia de conflicto de títulos y otras cuestiones anejas al desahucio, pero completamente impertinentes en este incidente, en el cual tratamos solamente de determinar si el señor Vallecillo tomó posesión de la totalidad de la finca por él adquirida o no. En las consideraciones ya expuestas en el curso de esta opinión hemos razonado los fundamentos por los cuales creemos que en un procedimiento sumarísimo y constreñidor como éste que ahora decidimos, no cabe resolver si todo un pueblo, todo un caserío, que desde tiempo inmemorial se estableció en aquel lugar, debe ser demolido y arrasado porque a un señor se le antoje decir que esas tierras son parte integrante de su finca. El juzgador no tendría reparos en ordenar la destrucción de dicho caserío siempre que el señor Vallecillo hubiese demostrado sin lugar a dudas ser dueño de aquellas tierras. Pero si no ha probado esta circunstancia, no puede decretarse el desalojo de las personas que ocupan aquel sitio."

Hemos leído cuidadosamente el alegato del apelante que contiene primero un extracto completo de la prueba y que

luego impugna separadamente ocho conclusiones de la corte al apreciar la misma.

Puede que la corte fuera demasiado lejos en algunas de sus apreciaciones, pero en general su actitud frente al problema que se le presentara es correcta, a nuestro juicio.

Argumentando su noveno señalamiento de error, que los resume todos, se expresa el apelante como sigue:

"Es evidente de la discusión de los anteriores errores, que el Hon. Rafael Sancho Bonet cometió error manifiesto en la apreciación de la prueba.

"Decimos que cometió error en la apreciación de la prueba y nada observamos con respecto a las jurisdicciones del Artículo 175 de la Ley Hipotecaria; a la teoría sentada en el caso de *Arroyo* v. *Zavala*, 40 D.P.R. 269; y otros principios legales, porque la corte realmente parece admitir nuestra razón desde el punto de vista técnico y solamente se ha abstenido de ordenar el desalojo de los recurridos, fundándose en cuestiones de hecho.

"Solamente deseamos hacer la siguiente observación: Este procedimiento no es uno constreñido y perentorio. Por el contrario es uno amplio, porque creíamos necesario atemperarnos a la última jurisprudencia sentada por este tribunal. Por ello en vez de pedir una orden perentoria de lanzamiento, presentamos nuestra moción en el sentido de que se les diese una oportunidad a los requeridos de ser oídos. A éstos se les dió pues su día en corte."

Hubiera sido conveniente una más amplia exposición de la ley y la jurisprudencia que se citan en relación con el procedimiento seguido en este caso.

El artículo 175 del Reglamento Hipotecario, no de la Ley, se refiere a la no suspensión de los procedimientos ejecutivos sumarios excepto en los casos que especifica. Y en el curso de la opinión emitida por el Juez Asociado Sr. Texidor, para fundar la sentencia en el caso de *Arroyo* v. *Zavala*, 40 D.P.R. 269, 279, se dijo: "Y el procedimiento ejecutivo hipotecario no termina con la subasta, sino con la posesión, la escritura y su inscripción," pero ni la ley ni la jurisprudencia que se invocan determinan el alcance del procedimiento a seguir para poner en posesión al acreedor.

Lo que se hizo en este caso parece lógico, quizá lo más a que puede llegarse dentro del propio procedimiento ejecutivo hipotecario. Si los títulos, explicados por la prueba, hubieran presentado un caso completamente claro, la orden para el lanzamiento pudo tal vez haberse decretado, pero la realidad demostró una situación que debe dilucidarse con mayores oportunidades para dictar una sentencia que fije con certeza el alcance de todos los intereses envueltos.

No se trata de una colindancia perfectamente determinada sobre el terreno. Con la zona marítima expresa el título que la finca colinda por el Norte y la Ley de Puertos española, extendida a Puerto Rico en mayo 3, 1886, dice:

"La zona marítimo-terrestre en las costas y playas de la Isla de Puerto Rico e islas adyacentes que forman parte del territorio español, es aquel sitio donde el mar fluye y refluye caso de que se sienta el influjo de las mareas; y donde no se sienten las mareas es el punto a donde llegan las mayores olas durante las tormentas.

Esta zona marítimo-terrestre también existe y se extiende en ríos que sean navegables o que estén influenciados por las mareas."

No se trata de una casa ni de dos. Pasan de veinte, indicando la prueba que hay muchas más que al parecer no se discuten y que forman un caserío cerca del sitio denominado "El Cañito."

No se trata tampoco de una situación que ha surgido de momento, si que existe desde hace más de treinta años, siendo por el contrario la adquisición del demandante reciente. En el título de adquisición no se dilucida. No se hace ni siquiera referencia a ella. El antiguo dueño no fué llamado a declarar.

Siendo ésas a grandes rasgos las circunstancias concurrentes, no nos sentimos inclinados a revocar el fallo recurrido. No se ha justificado la procedencia del recurso y en su consecuencia debe declararse sin lugar y confirmarse la resolución apelada.

El Juez Asociado Señor Córdova Dávila no intervino.